FILED

2013 Oct-28  PM 02:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DEBRAH J. MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-2007-NE** |
| | ) | |
| **JACKSON COUNTY BOARD** | ) | |
| **OF EDUCATION and KENNETH** | ) | |
| **HARDING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Debrah J. Moore, asserts a single claim for disability discrimination pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. (the "Rehabilitation Act" or "the Act"), against her former employer, the Jackson County Board of Education, as well as against Kenneth Harding, the Superintendent of the Jackson County Board of Education.[1]  The case currently is before the court on defendants' motion for summary judgment.[2]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that the motion should be granted.

---

[1]  *See* doc. no. 15 (Amended Complaint).  Defendants interpreted plaintiff's Amended Complaint as also possibly asserting a claim for disparate impact discrimination, and they argued in their brief that summary judgment also should be granted on that claim.  *See* doc. no. 23 (defendants' brief), at 23-24.  Plaintiff acknowledged in her response brief, however, that she had not asserted a disparate impact claim.  *See* doc no. 26 (plaintiff's brief), at 18 ("Defendants are not entitled to summary judgment on a disparate-impact claim because Ms. Moore did not plead such a claim.").

[2] Doc. no. 23.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. STATEMENT OF RELEVANT FACTS

Plaintiff, Debrah J. Moore, began her employment with the Jackson County Board of Education ("the Board") in 1979, as a substitute cafeteria worker.[3] She continued to work for the Board in various cafeteria-related capacities until her retirement on June 1, 2011.[4] Her last position, and the one she occupied at all times relevant to her claims in this lawsuit, was as the Child Nutrition Program ("CNP") cafeteria manager at Bridgeport Elementary School.[5] At all relevant times, Bridgeport Elementary School serviced approximately 200 students, and its cafeteria employed two workers, in addition to the Cafeteria Manger.[6]

The job description for the Child Nutrition Program Cafeteria Manager states that the "essential functions" of the job are:

---

[3] Defendants' evidentiary submission, Exhibit E (Deposition of Debrah J. Moore), at 8-9.

[4] *Id.* at 38.

[5] *Id.* at 34-35, 38.

[6] *Id.* at 37.

1.      Supervise receiving and storage of all CNP products.

2.      Insure [sic] that all Federal and State health regulations are followed.

3.      Insure [sic] that a quality menu is prepared and served on time.

4.      Prepare or insure [sic] preparation of all paperwork required by CNP.

5.      Monitor the operation and maintenance of all equipment.

6.      Maintain current and accurate records of all Free/Reduced applications and food production records.

7.      Responsible for the cleanliness and appearance of cafeteria.

8.      Attend all manager meetings and workshops as required.

9.      Insure [sic] that all employees are properly trained.

10.     Work with principal and/or CNP Supervisor to correct any problems that arise.

11.     Exhibit good hygiene and dress appropriately.

12.     Relate well with co-workers, students, and staff.

13.     Demonstrate a supportive attitude toward the CNP Program.

14.     Maintain confidentiality of all CNP records.

15.     Any and other [sic] essential functions assigned by the Superintendent or his/her designee.[7]

---

[7] Defendants' evidentiary submission, Exhibit A (Deposition of Kenneth Harding), at Exhibit 1 (Child Nutrition Manager job description) (alterations supplied).

-4-

Kenneth Harding, the Superintendent of Education, attested that plaintiff's duties as cafeteria manager included all the duties listed in the job description and that, additionally,

> Ms. Moore was required to assist in all other jobs or duties performed in the cafeteria which included, but are not limited to, cooking, cleaning, and any other duty performed by the CNP cafeteria workers. On a daily basis, if Ms. Moore did not assist the CNP workers in the performance of those duties, she was in essence neglecting her dutes [sic] as CNP cafeteria manager.[8]

Harding clarified during his deposition that cafeteria managers were required to "help[] out in the lunchroom," because most cafeterias had only two or three employees, and there were not enough workers to cover the everyday tasks if the manager did not help.[9]  Joseph Vaughn, the Child Nutrition Program Supervisor, attested that plaintiff's duties "included, but were not limited to, supervision of CNP cafeteria workers, completion of paperwork for CNP, assist in handling, storing, and preparing food, and assistance in cleaning the cafeteria."[10]  Plaintiff testified that her duties as cafeteria manager included preparing paperwork, conducting inventory assessments, creating schedules, managing money, and making deposits.[11]  She also assisted the other cafeteria workers with cooking and cleaning duties when she had

---

[8] Defendants' evidentiary submission, Exhibit B (Affidavit of Kenneth Harding) ¶ 5 (alteration supplied).

[9] Harding Deposition, at 20 (alteration supplied).

[10] Defendants' evidentiary submission, Exhibit C (Affidavit of Joseph K. Vaughn) ¶ 2.

[11] Moore Deposition, at 28.

time.  Other cafeteria managers under whom plaintiff previously had worked did not assist with cooking and cleaning duties, however.[12]  Finally, Brenda McCrary, who became the cafeteria manager at Bridgeport Elementary School after plaintiff's retirement in August of 2012,[13] and who also filled in for plaintiff while she was on sick leave, testified that her duties as cafeteria manager included planning menus, filing paperwork, operating the cash register, processing applications for free and reduced lunches, cooking breakfast, helping the other workers when "time allotted," preparing and delivering snacks for the after-school program, cleaning, placing orders, conducting inventory assessments, processing food deliveries, and reporting any equipment malfunctions.[14]

On July 5, 2010, plaintiff telephoned Joseph Vaughn, the Child Nutrition Program Supervisor, to inform him that she had broken her ankle at home and had undergone surgery, but she had not yet been back to see her doctor after her surgery.[15] Immediately after plaintiff's injury and surgery, her doctors provided her with crutches, but she soon switched to using a wheelchair, because the chair made it easier for her to move around.  As her recovery progressed, she began using a walker, and

---

[12] *Id.* at 30-31.

[13] Nothing about the end of plaintiff's employment is at issue in this case.

[14] Defendants' evidentiary submission, Exhibit D (Deposition of Brenda G. McCrary), at 9-14.

[15] Moore Deposition, at 54-55.

then a cane.[16]

During plaintiff's July 5 conversation with Vaughn, she did not make any statements about her ability to perform her job duties, and she did not state whether her physician had approved her to return to work.[17]  Plaintiff also did not request any job-related accommodation during that conversation.[18]  Vaughn informed plaintiff that she would need to speak with Kenneth Harding, the Superintendent of Education, about her injury,[19] and he transferred her call to Harding.[20]  Plaintiff informed Harding of her injury and subsequent surgery, and Harding told her to let him know when she got another report from her doctor regarding the progress of her recovery.[21]

Plaintiff returned to her doctor on July 29, 2010.  That same day, she telephoned Harding again to inform him that her doctor had released her to return to work, provided that she performed only her management duties, like paperwork and operating the cash register, and not any more active functions, like cooking or cleaning.  Harding informed plaintiff that she could not return to work until she could

---

[16] *Id.* at 53-54, 99-100.

[17] Vaughn Affidavit ¶ 5.

[18] *Id.* ¶ 6.  Neither party explicitly stated this anywhere in the record, but the court surmises that no discussions about plaintiff's ability to perform work-related activities occurred at this time because school was out of session for the summer, and plaintiff would not have been working in any event.

[19] *Id.*

[20] Moore Deposition, at 56-57.

[21] *Id.* at 57.

perform *all* the functions required by her job, including cooking and cleaning.[22] Harding testified that decisions about when Board employees are permitted to return from sick leave are made on a case-by-case basis, depending on the nature of the employee's sickness or injury and the nature of the employee' request.[23]   Although there is no formal, written policy to this effect, an employee generally is not permitted to return to work until he or she has a "full release"; or, in other words, until the employee can perform all duties of his or her job.[24]   Harding also attested that, if plaintiff had been permitted to return to work under the duty restrictions she requested (only performing paperwork and operating the cash register), the Board would have been required to hire another cafeteria worker to perform the other duties (cooking and cleaning) plaintiff could not perform.[25]

Plaintiff spoke to Harding again the next day, July 30, 2010, when Harding informed her that she could take leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (the "FMLA") while she continued to recover.[26]   On July 31, 2010, plaintiff requested a six-week period of FMLA leave.[27] On August 31,

---

[22] *Id.* at 58-60; Harding Affidavit ¶ 6.

[23] Harding Deposition, at 11.

[24] *Id.* at 21-23.

[25] Harding Affidavit ¶ 6.

[26] Moore Deposition, at 60-62; Harding Affidavit ¶ 6.

[27] Moore Deposition, at 60-65; Harding Affidavit ¶ 7.

2010, she requested that her leave be extended for an additional six weeks, because she needed additional physical therapy to be able to walk properly.[28]   Most of plaintiff's leave period was unpaid, because she had used up all of her paid sick leave.[29]

Plaintiff remained on FMLA leave from the first day of the 2010-2011 school year until October 14, 2010, when she returned to work.[30]   In the meantime, when Vaughn learned that plaintiff had requested FMLA leave, he temporarily assigned plaintiff's management duties to Brenda McCrary, who then was a cafeteria worker at another school, until plaintiff could return to work.[31]

On October 13, 2010, plaintiff telephoned Vaughn to inform him that she would be returning to work the following day.[32]   Plaintiff also produced a note from her physician, Dr. Masoud Hamidian, dated October 13, 2010, stating that she could "return to work without restrictions."[33]   Dr. Hamidian's office notes from that same day state that plaintiff was "doing well," but she still used crutches "at times."[34] Plaintiff's clinical examination revealed that her incisions were healed, and she had

---

[28] Moore Deposition, at 65-68; Harding Affidavit ¶ 7.

[29] Moore Deposition, at 61-62.

[30] Harding Deposition, at 28-29.

[31] Vaughn Affidavit ¶ 7; Harding Affidavit ¶ 8.

[32] Moore Deposition, at 68-70; Vaughn Affidavit ¶ 8.

[33] Moore Deposition, Exhibit 1, at document bearing Bates Stamp No. 000010.

[34] *Id.* at document bearing Bates Stamp No. 000009.

no deformities and "good range of motion with very minimal residual stiffness in [the] ankle."[35]  An x-ray revealed that plaintiff's fracture had healed.  Dr. Hamidian's recommendations were as follows:  "I encouraged her to discontinue using crutches and continue home exercises.  Get back to a normal routine.  I will see her back as needed."[36]

## III. DISCUSSION

Plaintiff contends that defendants violated her rights under the Rehabilitation Act when they refused to allow her to return to work with accommodations.[37]  "The Rehabilitation Act prohibits recipients of federal financial assistance from discriminating against individuals with disabilities." *Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1310 (11th Cir. 2007) (citing *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)).[38]  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in [cases founded upon the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*]." *Cash v.*

---

[35] *Id.* (alteration supplied).

[36] *Id.*

[37] Amended Complaint ¶ 17 ("Defendants' refusal to allow Plaintiff to return to her employment with accommodations is a direct violation of § 504 in that Defendants:  a. discriminated against Plaintiff with respect to the terms, conditions, or privileges of employment because of her disability, which was unrelated to her ability to perform the duties of her regular job; and b. failed to accommodate or otherwise make available provisions to Plaintiff as required by law.").

[38] Defendants do not appear to dispute that they are recipients of federal financial assistance, or that they, therefore, fall under the Rehabilitation Act.

*Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)) (footnote omitted, alteration supplied); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).  Thus, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice versa*."  *Cash*, 231 F.3d at 1305 n.2 (citing *Pritchard v. Southern Company Services*, 92 F.3d 1130,  1132 n.2 (11th Cir. 1996)) (alteration supplied).

"In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA [or Rehabilitation Act] violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (alteration supplied); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA [or Rehabilitation Act] claims.") (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)) (alteration supplied).

To establish a *prima facie* case of disability discrimination, plaintiff must demonstrate:  (1) that she has a "disability" within the meaning of the Act; (2) that she is "a qualified individual with a disability," meaning that she can perform the essential functions of the employment position she holds or seeks, with or without reasonable

accommodation being made by the employer; and (3) that she suffered an adverse employment action because of her disability. *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

## A.    "Disability"

The ADA (and, concomitantly, the Rehabilitation Act) provides that an individual is under a "disability" if she suffers "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).[39] The term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking*, *standing*, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (emphasis supplied).[40] A "major life activity" can also include "the operation of a major bodily function, including but not limited to, functions of the immune system,

---

[39] The Act also provides that an individual is disabled if she has "a record of such an impairment," or has been "regarded as having such an impairment." 42 U.S.C. § 12012(1)(B) & (C). Plaintiff does not allege disability under either of those definitions. Instead, she claims that she actually was disabled under the Act.

[40] *See also* 29 C.F.R. § 1630.2(i)(1)(i) ("Major life activities include, but are not limited to: (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking*, *standing*, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working.") (emphasis supplied).

normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).[41] In this case, plaintiff asserts that, as a result of her ankle injury, she was substantially limited in the major life activities of "standing, walking, running, and musculoskeletal function."[42]

There is no dispute that, while plaintiff was recovering from her ankle injury, she was at times required to use assistive devices like crutches, a wheelchair, a walker, and a cane in order to be mobile. Thus, plaintiff's broken ankle at least temporarily limited her major life activities of walking, running, and even standing, and it certainly limited her musculoskeletal function. The remaining question is whether those temporary limitations can be considered *substantial* under the Act.

If plaintiff's injury had occurred before January 1, 2009, that question clearly would have been answered "no." In a 2007 decision, the Eleventh Circuit described the method of evaluating "disabilities" that then applied to ADA claims:

> Further, in considering whether an individual has a disability, the regulations advise that the following factors are relevant: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of

---

[41] *See also* 29 C.F.R. § 1630.2(i)(1)(ii) ("Major life activities include, but are not limited to: . . . (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, *musculoskeletal*, and reproductive functions.") (emphasis supplied).

[42] Amended Complaint ¶ 15.

-13-

the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).  As further explained by the EEOC, "*temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities*. Such impairments may include, but are not limited to, *broken limbs*, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R.App. § 1630.2(j).

*Garrett*, 507 F.3d at 1311 (emphasis supplied).  Under *Garrett* and the regulatory provisions in effect in 2007, the temporary impairments plaintiff experienced as a result of her broken ankle would *not* have been considered a "disability."

However, *Garrett* no longer applies in light of the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008), effective Jan. 1, 2009. The general effect of those amendments was to broaden the ADA's coverage. *See* 42 U.S.C. § 12101 note (2008) (Findings and Purposes);[43] *see also* 29 C.F.R

---

[43] The note includes the following findings:

Pub.L. 110-325, § 2, Sept. 25, 2008, 122 Stat. 3553, provided that:

"(a) Findings. — Congress finds that–

  "(1) in enacting the Americans with Disabilities Act of 1990 (ADA) [Pub. L. 101-336, July 26, 1990, 104 Stat. 327, which enacted this chapter and 47 U.S.C.A. § 225, amended 29 U.S.C.A. § 706, and 47 U.S.C.A. §§ 152, 221, and 611; for complete classification, see Short Title note set out under this section and Tables], Congress intended that the Act [this chapter] 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' *and provide broad coverage*;

  . . . .

  "(4) the holdings of the Supreme Court in *Sutton v. United Air Lines,* Inc.,

-14-

§1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA.").  In keeping with the broad scope of the ADAAA, the EEOC modified the ADA regulations addressing the definition of a "disability," effective May 24, 2011.  *See* 76 F.R. 16978-01 (entered March 25, 2011; effective May 24, 2011).  The revised regulations read:

(j) Substantially limits –

(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i) The term "substantially limits" shall be construed

---

527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

"(5) the holding of the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

"(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

"(7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress; and

"(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term 'substantially limits' as 'significantly restricted' are inconsistent with congressional intent, by expressing too high a standard.

42 U.S.C. § 12101 note (2008) (Findings and Purposes) (alterations in original).

broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without

-16-

regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii) An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. *The effects of an impairment lasting or expected to last fewer than six months **can be** substantially limiting within the meaning of this section.*

29 C.F.R. § 1630.2(j) (all emphasis supplied).

Defendants assert that the revised regulations do not apply to plaintiff's claim, both because plaintiff's injury occurred *before* the revised regulations were adopted, and because the regulations cover only claims brought under § 501 of the Rehabilitation Act, not claims, like plaintiff's, that arise under § 504.[44] The court does

---

[44] Section 501 prohibits disability-based discrimination by federal agencies of the executive branch. 29 U.S.C. § 791. Section 504 prevents disability-based discrimination by recipients of federal funding. 29 U.S.C. § 794. After revising the ADA regulations to comport with the ADAAA, the EEOC issued a publication entitled *Questions and Answers on the Final Rule Implementing the A D A   A m e n d m e n t s   A c t   o f   2 0 0 8 ,   a v a i l a b l e   a t* http://www.eeoc.gov/laws/regulations/ada_qa_final_rule.cfm. (last visited October 22, 2013). That publication stated, in pertinent part: "The EEOC's final regulations apply to Title I of the ADA and section 501 of the Rehabilitation Act, but they do not apply to Titles II and III of the ADA, or

not need to decide whether the revised regulations should be applied retroactively, or whether plaintiff's § 504 claim is exempt from the regulatory provisions.[45]  Even if the revised EEOC regulations are not binding in a technical sense, they still remain highly persuasive with regard to the intended scope and meaning of the ADAAA.[46]

The court concludes, in light of the stated purpose of the ADAAA to broaden the coverage of the ADA (and, thus, the Rehabilitation Act), and especially the definition of the phrase "substantially limits," and in consideration of the persuasive regulatory provisions interpreting the ADAAA, that Congress no longer intends for temporary impairments to be excluded from the definition of "disability."  Plaintiff's ankle injury impairment substantially limited her ability to perform the major life activities of standing, walking, running, and her general musculoskeletal function. The fact that the limitation was temporary is irrelevant.  Accordingly, plaintiff was under a disability, as that term is defined by the Rehabilitation Act, from the date of her injury until she returned to work on October 14, 2010.

_____

sections 503 and 504 of the Rehabilitation Act."  *Id.* at Question 3.

[45] Plaintiff points the court to the regulations promulgated by the United States Department of Education, presumably in an effort to demonstrate that those regulations apply, even if the EEOC's regulations do not.  *See* 34 C.F.R. § 104.1 *et seq.*  The Department of Education regulations are similar to the EEOC regulations, and they can be considered for their persuasive value just as the EEOC regulations can.

[46] One of the stated purposes of the ADAAA was "to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly restricted' to be consistent with this Act . . . ."  42 U.S.C. § 12101 note (2008) (Findings and Purposes, § (b)(6)).

**B.**     **Qualified Individual With A Disability**

The term "qualified individual with a disability" is statutorily defined as

an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.   For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

**1.**     **Essential functions**

The first question that must be answered is whether plaintiff could perform the

essential functions of the cafeteria manager position.  In general, "[t]he term essential

functions means the fundamental job duties of the employment position the individual

with a disability holds or desires," but it does not include "the marginal functions of

the position."  29 C.F.R. § 1630.2(n)(1) (alteration supplied).  Additionally:

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(*i*) The function may be essential because the reason the position exists is to perform that function;

(*ii*) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(*iii*) The function may be highly specialized so that the

incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(*i*) The employer's judgment as to which functions are essential;

(*ii*) Written job descriptions prepared before advertising or interviewing applicants for the job;

(*iii*) The amount of time spent on the job performing the function;

(*iv*) The consequences of not requiring the incumbent to perform the function;

(*v*) The terms of a collective bargaining agreement;

(*vi*) The work experience of past incumbents in the job; and/or

(*vii*) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(2)-(3).

Defendants assert that the essential functions of plaintiff's position as a cafeteria manager included not just paperwork, operating the cash register, and other managerial duties, but also cooking and cleaning.  Most of the above statutory and regulatory factors weigh in favor of defendants' argument.[47]  Plaintiff's cooking and

---

[47] Some of the factors do not come into play at all under the facts of this case.  For example, there is no evidence that plaintiff's position was so highly specialized that she was hired for her

cleaning duties could be considered "essential" because her position existed, at least in part, to perform those duties. *See* 29 C.F.R. § 1630.2(n)(2)(i). Even more importantly, there was a limited number of employees among whom those job duties could be distributed. *See* 29 C.F.R. § 1630.2(n)(2)(ii). Plaintiff's cafeteria employed only two other workers, yet it was required to supply food for approximately 200 students on a daily basis.

The factors set forth in 29 C.F.R. § 1630.2(n)(3) also weigh in defendants' favor. First, in defendants' judgment, cooking and cleaning duties were essential to plaintiff's position. *See* 29 C.F.R. § 1630.2(n)(3)(i)-(ii). Even though the job description for cafeteria manager does not explicitly state that the manager is required to perform cooking and cleaning duties, it does state that the manager is required to perform any additional duties as assigned by the Superintendent or his designee. *See Davis*, 205 F.3d at 1306 (holding that a job function can be considered "essential" even if it is not listed in the formal job description, as long as there is other evidence of essentialness). The Superintendent and the Child Nutrition Program Supervisor both testified that a cafeteria manager's job duties included performing some tasks also performed by the cafeteria workers, including cooking and cleaning. *See Holly*

---

expertise in cooking and cleaning, under 29 C.F.R. § 1630.2(n)(2)(iii). There also is no evidence of a collective bargaining agreement governing the terms of plaintiff's employment. *See* 29 C.F.R. § 1630.2(n)(3)(v).

*v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) ("[W]hen considering the employer's judgment regarding what is an essential function, we have previously considered not only the company's 'official position,' but also testimony from the plaintiff's supervisor.") (citing *D'Angelo v. ConAgra Foods, Inc*., 422 F.3d 1220, 1230 (11th Cir. 2005)) (alteration supplied).  Plaintiff acknowledged that she assisted the other cafeteria workers with cooking and cleaning when she had time, and Brenda McCrary, who filled in for plaintiff as cafeteria manager while plaintiff was on sick leave and ultimately replaced plaintiff upon her retirement, testified that she also performed cooking and cleaning tasks as needed.  *See* 29 C.F.R. § 1630.2(n)(3)(vi)-(vii).

It is not clear from the record how much time plaintiff typically spent cooking and cleaning on any given day, probably because she performed those tasks on an as-needed basis.  It does seem apparent, however, that plaintiff did *some* amount of cooking and cleaning on a regular basis.  The regularity of her cooking and cleaning duties weighs in favor of considering those duties to be "essential."  *See* 29 C.F.R. § 1630.2(n)(3)(iii).  *See also Holbrook*, 112 F.3d at 1527 (holding that a police officer's duties were essential, even though the officer spent "a relatively small amount of time performing" those duties).

Finally, the consequence of allowing plaintiff to return to work, but *not*

requiring plaintiff to perform her cooking and cleaning duties, also weighs in favor of finding those duties to be essential. *See* 29 C.F.R. § 1630.2(n)(3)(iv).  Harding testified that if plaintiff had been allowed to return to work without performing her cooking and cleaning duties, the Board would have been required to hire another person to perform those duties.  Plaintiff has not offered any evidence to refute Harding's testimony.

In summary, based on the totality of all of the above factors, plaintiff's cooking and cleaning duties were an essential function of her position as a cafeteria manager. It appears undisputed that plaintiff could not perform those functions without some sort of accommodation until October of 2010.

### 2.    Reasonable accommodation

The next question is whether plaintiff could have performed the essential functions of her position as a cafeteria manager — including cooking and cleaning — if defendants had provided her with a reasonable accommodation.  A "reasonable accommodation" includes:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals

with disabilities.

42 U.S.C. § 12111(9).

An employer discriminates against an otherwise qualified individual with a disability if the employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). An "undue hardship" is "an action requiring significant difficulty or expense, when considered in light of" the following factors:

> (*i*) the nature and cost of the accommodation needed under this chapter;

> (*ii*) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

> (*iii*) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

> (*iv*) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

-24-

42 U.S.C. § 12111(10).

The Eleventh Circuit has held that "[a]n accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir.1998) (in turn citing 29 C.F.R. § 1630.2( o)(2)(ii) (1995))) (alteration supplied).

> The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir.1997). Furthermore, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Willis v. Conopco, Inc*., 108 F.3d 282, 285 (11th Cir. 1997). Finally, before an employer has a duty to show undue hardship, the plaintiff first must show that a reasonable accommodation exists. *See id.* at 286.

*Earl,* 207 F.3d at 1367.

The only accommodation plaintiff ever requested — and the only one she mentions in her brief — was to not be required to perform any cooking and cleaning duties.  *See Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1363 (11th Cir. 1999) (citing *Wood v. President and Trustees of Spring Hill College in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992)) ("[A] plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against

him by failing to provide a reasonable accommodation unless he demanded such an accommodation.") (alteration supplied).  However, plaintiff's request would not *allow* her to perform the essential functions of her job; instead, it would *exempt her* from performing those functions.  Moreover, the only way to accommodate plaintiff's request would be to reassign her cooking and cleaning duties to other workers, which, according to the Superintendent's uncontradicted testimony, would result in the Board being required to hire an additional cafeteria worker in order to satisfy the necessity to produce sufficient food for more than 200 students.  The Eleventh Circuit has held "that '[a]n employer is not required by the ADA to reallocate job duties in order to change the essential functions of a job.'"  *Earl,* 207 F.3d at 1367 (quoting *Holbrook*, 112 F.3d at 1528) (alteration in *Earl*).

Plaintiff has failed to satisfy her burden of identifying a reasonable accommodation that would have allowed her to perform *all* the essential functions of her job as a cafeteria manager.  Accordingly:  (1) she is not a "qualified individual with a disability," as is required for her Rehabilitation Act claim; (2) defendants are not required to demonstrate that any proposed accommodation would present an undue hardship; and (3) defendants were not required to engage in the "interactive process" discussed in the EEOC regulations in order to determine an appropriate

accommodation.[48]

### 3.    Defendants' alleged "100% healed" policy

Plaintiff also makes a somewhat distinct argument that the Board's policy that employees cannot return to work until they are able to perform all of their job duties violates the ADAAA's prohibition against so-called "100% healed" policies, or policies that require employees to be completely recovered from their injury or illness before they can return to work.  It is true that the ADAAA makes it unlawful to use

> qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6).  It also is unlawful to " limit[], segregat[e], or classify[] a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1) (alterations supplied).  Instead, as the Supreme Court has advised, the determination of whether a disabled employee is otherwise qualified for a position is an "individualized inquiry."  *School Board of Nassau County, Florida v.*

---

[48] *See* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.").  Plaintiff argued in her brief that Superintendent Harding "shut down the interactive process before it started" when he told plaintiff that she could not return to work until she could perform all of her previous duties. *See* doc. no. 26 (plaintiff's brief), at 15-16.

*Arline,* 480 U.S. 273, 287 (1987).  The purpose of that individualized inquiry is to protect "handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks."  *Id.*

In keeping with these principles, several Circuit Courts of Appeal have found that employer policies requiring an injured or sick employee to be completely healed or recovered in order to return to work are unlawful.  *See, e.g., Hohider v. United Parcel Service,* 574 F.3d 169, 194-96 (3rd Cir. 2009) (holding that a 100% healed policy violates the ADA if it has the effect of discriminating against *an otherwise qualified individual with a disability*); *Henderson v. Ardco, Inc.,* 247 F.3d 645, 653 (6th Cir. 2001) ("[A] 100% rule is impermissible as to a disabled person — *but one must first be disabled*.") (alteration and emphasis supplied); *McGregor v. National R.R. Passenger Corp.,* 187 F.3d 1113, 1116 (9th Cir. 1999) ("A "100% healed" or "fully healed" policy discriminates *against qualified individuals with disabilities* because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation.") (emphasis supplied); *Hendricks-Robinson v. Excel Corp.,* 154 F.3d 685, 698-99 (7th Cir. 1998)

(invalidating an employer's policy that made "physical fitness" a necessary job requirement).

This court has no reason to doubt that the Eleventh Circuit would adopt a similar holding if it were confronted with the issue. Even so, defendants' argument fails. First, there is no evidence that the Board actually has a "100% healed" policy. The Board did not inform plaintiff that she could not return to work until she was 100% healed from her ankle injury; it informed her that she could not return to work until she could perform all of her job duties. That distinction is important, as the latter is permissible under the Rehabilitation Act. Moreover, even if the Board did have such a policy, it would only violate the Rehabilitation Act *if it was applied to an otherwise qualified individual with a disability.* Because plaintiff is not a qualified individual with a disability, she would not be entitled to the protection of the Rehabilitation Act, even if the Board did have a facially unlawful "100% healed" policy.

### 4.    Summary

Plaintiff has not met her burden of establishing that she is a qualified individual with a disability, as required under the second prong of the *prima facie* case for disability discrimination. Accordingly, she cannot succeed on her Rehabilitation Act claim, and summary judgment is due to be granted in defendants' favor on that claim.

Moreover, because plaintiff failed to satisfy the second prong of the *prima facie* case, the court does not need to consider whether she has satisfied the third prong by proving that she suffered an adverse employment action because of her disability.

Finally, because summary judgment is due to be granted on the merits of plaintiff's Rehabilitation Act claim, the court also does not need to consider defendants' argument that plaintiff's claims against Superintendent Harding should be dismissed as redundant of her claims against the Board.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, the court finds that there are no genuine issues of material fact, and defendants are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 28th day of October, 2013.

_____
United States District Judge